TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
WILLIAM KANELLIS (Cal. Bar No. Pending)
LLOYD MASSON (Cal. Bar No. 270182)
Assistant United States Attorneys
General Crimes Section
      1200 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-6947/(213) 453-8455
      Facsimile: (213) 894-0141
      Email:     william.kanellis@usdoj.gov
                 Lloyd.masson@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, Plaintiff, v. ERIN PETRA ESCOBAR and NICK ELIAS GUTIERREZ, Defendants. | No. 2:25-cr-00656-AB<br><br>GOVERNMENT TRIAL MEMORANDUM<br><br>Trial Date: March 30, 2026<br>Trial Time: 8:30 a.m.<br>Location:   Courtroom of the Hon. André Birotte Jr. |
|---|---|

    Plaintiff United States of America, by and through its counsel
of record, the First Assistant United States Attorney for the Central
//
//
//
//
//

District of California and Assistant United States Attorneys William Kanellis and Lloyd Masson, hereby files its Trial Memorandum.

Respectfully submitted,

TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States
Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

_____*/s/*_____
WILLIAM KANELLIS
LLOYD MASSON
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

Defendants ERIN PETRA ESCOBAR and NICK ELIAS GUTIERREZ will stand trial for forcibly assaulting Federal Protective Service (FPS) inspectors while they were engaged in their official duties of protecting a Federal courthouse in Los Angeles.  Count I charges ESCOBAR with violating 18 U.S.C. § 111(a)(1) for physically assaulting an FPS inspector, C.C.  Count II charges GUTIERREZ with a violation of the same statute for physically assaulting a second FPS employee, B.M. Count III charges GUTIERREZ with subsections (a)(1) and (b) of section 111, for physically assaulting a third FPS employee, R.S., and causing his bodily injury. And Count IV charges ESCOBAR with misdemeanor depredation of Federal property, in violation of 18 U.S.C. § 1361. All four counts will be heard and decided by a jury.

The case emerges from ESCOBAR's and GUTIERREZ's actions on the afternoon of Thursday, July 17, 2025, during a public protest near the Roybal Federal Building and Courthouse (Roybal), located at 255 E. Temple St., Los Angeles, CA 90012.  Pursuant to FPS's public mission, FPS inspectors patrolling the exterior of Roybal were engaged in their official duties of (1) protecting Federal property, (2) protecting Federal employees and members of the public who were customers of the Federal agencies at Roybal and nearby Federal office buildings, and (3) ensuring that the protestors assembled in and around Roybal were able to safely exercise their First Amendment rights.  These FPS inspectors wore FPS uniforms with protective gear, and carried on their persons a panoply of security instruments needed

to carry out their public duties, including a baton, pepper spray, a taser, and a firearm.

At approximately 1:12 p.m., FPS inspectors observed ESCOBAR writing graffiti with a marker on several parts of barriers at the parking entrance to Roybal on Alameda Street. These barriers were Federal property. As ESCOBAR defaced Federal property, GUTIERREZ stood near her speaking through a bullhorn. An FPS supervisor, having observed ESCOBAR deface the Federal property, instructed FPS inspectors to detain ESCOBAR for violating Federal law. ESCOBAR's defacing of the Roybal parking barriers is charged as a misdemeanor in Count IV of the indictment. See 18 U.S.C. § 1361.

At approximately 1:15 p.m., ESCOBAR saw FPS inspectors approaching her and crossed Alameda Street to a tent on the sidewalk on the other side. GUTIERREZ also moved toward the other side of the street. Once in the tent, ESCOBAR began changing her clothing. FPS inspectors moved across the street, following ESCOBAR. FPS inspectors, including FPS inspector B.M., then attempted to detain ESCOBAR, and set up a perimeter to ensure that she was safely detained. ESCOBAR moved down the street away from the pursuing inspectors.

As these FPS Inspectors moved toward ESCOBAR, GUTIERREZ – unprovoked – put down his bullhorn and rushed FPS inspector B.M. GUTIERREZ grabbed B.M. by his bulletproof vest, shoved, and otherwise physically assaulted and obstructed B.M. GUTIERREZ's assault of B.M. is charged in Count II of the indictment. 18 U.S.C. § 111(a)(1).

//

2

Upon seeing GUTIERREZ assault FPS inspector B.M., other FPS inspectors, including FPS inspector R.S., went to the aid of B.M. to subdue GUTIERREZ and prevent him from further endangering FPS inspector B.M. and anyone else at the scene.  GUTIERREZ physically resisted efforts of other FPS inspectors to subdue him.  During the ensuing struggle with FPS inspectors, GUTIERREZ fell to the ground. After he fell to the ground, GUTIERREZ continued to resist FPS inspectors, kicking his legs.  At one point during the struggle, GUTIEREZ kicked FPS inspector R.S. in the chest.  The kick struck R.S. with such force that it knocked him backwards, causing him to severely injure his left ring finger.  GUTIERREZ's fighting with FPS inspectors and kicking of FPS inspector R.S. is charged in Count III of the indictment.  18 U.S.C. § 111(a)(1), (b).

FPS inspectors eventually restrained and detained both GUTIERREZ and ESCOBAR.  After detaining ESCOBAR, two FPS inspectors, including FPS inspector C.C., began to transport ESCOBAR to a holding cell at 300 N. Los Angeles Street.  ESCOBAR physically resisted FPS's efforts to detain her, dropping her body weight to impede these efforts.  As FPS inspectors escorted ESCOBAR to the facility, ESCOBAR filled her throat with saliva and spit into the face of one of her escorts, FPS inspector C.C.  This conduct is charged in Count I of the indictment.  18 U.S.C. § 111(a)(1).

Trial is set to commence on March 30, 2026, at 8:30 a.m.

//

//

3

**II.   Length of Trial and Number of Witnesses**

   **A.   Government Case**

   The United States estimates that presentation of its case-in-chief will take approximately 3.5 to 4 hours, not including defense's cross-examination. The United States currently anticipates that it may call the following witnesses in its case-in-chief:

- FPS Inspector Raymond Stubbs (victim)
- FPS Inspector Cassidy Cheung (victim)
- FPS Inspector Chris Clanor
- FPS Inspector Daniel Dick
- FPS Inspector Thomas Smith
- US Navy Hospital Mate (HM) Alexander Hay
- FPS Inspector Nathan Amaral
- FPS Inspector Jeffrey Arnold
- FPS Inspector John De Silva

   The United States expects to enter into evidence approximately 30 exhibits, which will include surveillance video, photographs, documents, and pedagogical exhibits.  All of these exhibits will be properly authenticated and are admissible under the Federal Rules of Evidence.  See, e.g., Fed. R. Evid. 107, 611(a) & 901.

   **B.   Defendants' Cases**

   At this juncture, it is unclear what the defendants' defenses will be.  Section 111(a) requires the Government to prove only general intent, United States v. Lamott, 831 F.3d 1153, 1156 (9th Cir. 2016), and each defendant "may be convicted of violating section

4

111 if he or she uses any force whatsoever against a federal officer[.]" United States v. Dominguez-Maroyoqui, 748 F.3d 918, 921 (9th Cir. 2014).  Thus, the defendants' culpability regarding the three charged assaults of Federal employees, as well as ESCOBAR's defacing of Federal property, will turn upon simple questions of fact: that is, whether the jury finds that ESCOBAR and GUTIERREZ did what Government witnesses will testify they observed them doing.

The Government has filed a motion *in limine* to preclude the introduction of a self-defense argument, given that there is no *prima-facie* basis to make such an argument to the jury.  See United States v. Acosta-Sierra, 690 F.3d 1111, 1126 (9th Cir. 2012).  The motion was opposed on March 17, 2026.  Dkt. 50.

ESCOBAR's counsel have indicated that they intend to introduce into evidence certain video recordings.  As with all evidence, the Government expects that when seeking to introduce this evidence, ESCOBAR's counsel will ensure it is properly authenticated.

**III. APPLICABLE LAW**

**A.    Counts I and II: 18 U.S.C. § 111(a)(1) - Assault on a Federal Officer**

1.    General

18 U.S.C. § 111(a) makes it a crime when someone "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title [officers and employees of the United States] while engaged in or on account of the performance of official duties."  In the Ninth Circuit and elsewhere,

5

spitting on a Federal employee while in performance of his or her duties constitutes a violation of this statute. See, e.g., United States v. Stoddard, 407 F. App'x 231, 234 (9th Cir. 2011) ("Spitting . . . involves the type of non-injurious physical contact contemplated by § 111(a)'s felony provision").

### 2.    Elements of the offense

The elements of the offense are that (1) a defendant forcibly assaulted the victim; and (2) a defendant assaulted the victim while the victim was engaged in, or on account of, his official duties.

In the Ninth Circuit and elsewhere, spitting on a Federal employee constitutes a violation of section 111(a) of Title 18. See, e.g., United States v. Stoddard, 407 F. App'x 231, 234 (9th Cir. 2011) ("Spitting . . . involves the type of non-injurious physical contact contemplated by § 111(a)'s felony provision").

### 3.    Mens Rea

In the Ninth Circuit, section 111 is a general intent crime. No intent to injure is required to prove this offense. United States v. Sanchez, 914 F.2d 1355, 1358 (9th Cir. 1990).

### 4.    Anticipated Evidence

The evidence, offered in the form of witness testimony, and video and still images, will show that on July 17, 2025:

(a) Count I: ESCOBAR intentionally made physical contact with FPS inspector C.C., spitting in his face, thus assaulting, resisting, opposing and interfering with FPS inspector C.C. while he was engaged

6

in the performance of his official duties – i.e., physically escorting ESCOBAR into custody.

(b) Count II: GUTIERREZ intentionally and forcibly assaulted, opposed, impeded, and interfered with FPS inspector B.M., and in doing so, made physical contact with him, physically grabbing and obstructing B.M.  In so doing, GUTIERREZ assaulted, opposed and interfered with FPS inspector B.M. while engaged in the performance of his official duties – i.e., as he attempted to assist in FPS's detainment of ESCOBAR.

**B.    Count III: 18 U.S.C. § 111(a)(1) & (b) – Assault on a Federal Officer, with Bodily Injury**

1.    General: the elements of section 111(a)(1) are described in Section III.A.

2.    Sentencing Enhancement: subsection (b) stipulates that, "[w]hoever, in the commission of any acts described in subsection (a), . . . inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both."

3.    Elements of the Offense:

The elements of the offense are that (1) a defendant forcibly assaulted the victim; (2) a defendant assaulted the victim while the victim was engaged in, or on account of, his official duties; and (3) a defendant's conduct caused the victim to suffer bodily injury.

4.    Anticipated Evidence

The evidence, offered through witness testimony, video recordings, photographs, and documents, will show that on July 17,

7

2025, at approximately 1:15 p.m., as FPS inspectors attempted to take ESCOBAR into custody, GUTIERREZ attempted to impede and disrupt the FPS inspectors' efforts by rushing up to FPS inspector B.M. and physically assaulting him, grabbing at his protective gear and otherwise interfering with B.M.'s attempt to assist in the detainment of ESCOBAR.  Other FPS inspectors rushed to FPS inspector B.M.'s aid and prevent GUTIERREZ from endangering anyone else at the scene.

In the ensuing scuffle, GUTIERREZ fell to the ground. As FPS inspectors attempted to subdue him, GUTIERREZ continued to fight with them by, among other things, kicking his legs.

At one point during the fight, GUTIEREZ violently kicked FPS inspector R.S. in the chest. The kick struck FPS inspector R.S. with such force that it knocked him backwards onto his hand, causing FPS inspector R.S. to severely injure his left ring finger.  Together, these actions reflect that GUTIERREZ forcibly assaulted, resisted, opposed, impeded, intimidated, and interfered with FPS inspector R.S. and other FPS inspectors as they were engaged in the performance of their official duties, and by so doing, caused FPS inspector R.S. to experience bodily injury.

**C.    Count IV:**

1.    General

Section 1361 of Title 18 provides, in relevant part, that "[w]hoever willfully injures or commits any depredation against any property of the United States, or of any department or agency thereof, . . . or attempts to commit any of the foregoing offenses, .

8

. . if the damage or attempted damage to such property does not exceed the sum of $1,000, [shall be punished] by a fine under this title or by imprisonment for not more than one year, or both."

"Property" includes "anything of value, including real estate, tangible and intangible personal property, contract rights, choses-in-action and other interests in or claims to wealth...." United States v. Blount, 35 F.3d 572 (9th Cir. 1994) (quoting BLACK'S LAW DICTIONARY 635 (5th ed. abr. 1983), & Model Penal Code § 223.0).

In the Ninth Circuit, depredation of Federal property may include defacing, marking, or "spray painting graffiti on a government building[.]" United States v. Kincade, 379 F.3d 813, 846 (9th Cir. 2004); see also, e.g., United States v. Carlson, 2011 WL 13141452, at *1 (D. Idaho Sept. 15, 2011).

### 2. Elements of the Offense

The elements of the misdemeanor violation of section 1361 are that (1) the defendant willfully injured or committed a depredation, or attempted to injure or commit a depredation, (2) against the property of the United States. Id. at 650.

### 3. Mens Rea

The Government must show that ESCOBAR had the specific intent to "willfully injury[] or commit [] any depredation against any property of the United States." United States v. Blount, 35 F.3d 572 (9th Cir. 1994) (citing 18 U.S.C. § 1361).

//

//

9

#### 4.   Anticipated Evidence

The Government will introduce exhibits, including surveillance video, still photographs, witness testimony, and documents, showing that on July 17, 2025, at approximately 1:12 p.m., ESCOBAR spray-painted graffiti on parking barriers at the entrance to Roybal. Evidence will show that ESCOBAR wrote on the barrier the phrases, "Fuck ICE" and "KYS."[1]

## IV.  PENALTIES

### A.   Counts I and II – Felony

Where a defendant violates section 111(a)(1) of Title 18 and the assault involves physical contact with the victim, it is punishable by imprisonment of not more than eight years. The defendant may be required to pay a fine of not more than $250,000, 18 U.S. Code § 3571(b)(3), and a special assessment of $100. 18 U.S. Code § 3013(a)(2)(A).

### B.   Count III – Felony

Where a defendant engages in an assault involving physical contact with the victim of the assault, and inflicts bodily injury on the victim, section 111(b) of Title 18 is punishable by imprisonment of not more than 20 years.  The defendant may be required to pay a fine of not more than $250,000, 18 U.S. Code § 3571(b)(3), and a special assessment of $100.  18 U.S. Code § 3013(a)(2)(A).

---

[1] "KYS" is understood to be an acronym for, "kill yourself."

**V.    PRETRIAL MOTIONS**

**A.    Government Motion**

1.    The Government's Motion in Limine to Preclude Self-Defense Arguments was filed on March 11, 2026.  Dkt. 45).  Defendants responded on March 17, 2026 (Dkt. 50)  The Motion is set for hearing on March 26, 2026 at the Pretrial Conference.

2.    The Government, on the date of the extant filing, also filed a motion in limine under seal, relating to the ability of a witness to testify at trial.

**B.    Defense Motion**

1.    Defendant ESCOBAR'sMotion to Preclude Introduction of Prior Acts Evidence was filed on March 11, 2026.  (Dkt. 47.)  The Government responded on March 19, 2026.  (Dkt. 51.)  The Motion is set for hearing on March 26, 2026 at the Pretrial Conference.

**VI.    LEGAL AND EVIDENTIARY ISSUES**

**A.    Scope of Cross-Examination of Defendant**

If a defendant testifies at trial, he or she waives the right against self-incrimination and the government will cross-examine him on all matters reasonably related to the subject matter of his testimony.  See Fitzpatrick v. United States, 178 U.S. 304 (1971) ("The defendant cannot assert a self-incrimination privilege 'on matters reasonably related to the subject matter of his cross-examination.'"); United States v. Black, 767 F.2d 1334, 1341 ("permissible cross-examination questions "'are reasonably related' to the subjects covered by the defendant's testimony.").

11

The scope of cross-examination is within the discretion of the trial court.  Fed. R. Evid. 611(b).  The defendant has no right to avoid cross-examination on matters that call into question his claim of innocence if a defendant "open[s] the door." See United States v. Alexander, 48 F.3d 1477, 1488 (9th Cir. 1995), as amended on denial of reh'g (Apr. 11, 1995) ("When a defendant takes the stand and denies having committed the charged offense, he places his credibility directly at issue.").

**B.    Jury Nullification**

Defendants may argue that the evidence presented at trial is insufficient to support a guilty verdict. But they should be precluded from making arguments or introducing evidence that are irrelevant to the elements of the charged offenses, or that tend to promote jury nullification.

Trial courts "have a duty to forestall or prevent" jury nullification, including by prohibiting "impermissible" defense questioning or argument.  United States v. Lynch, 903 F.3d 1061, 1079–80 (9th Cir. 2018) (citation omitted).  In this case, Federal Rules of Evidence 401, 402, and 403, and the Ninth Circuit's prohibition on jury nullification impel that the Court preclude any reference, question, or argument concerning immigration policy or enforcement as a matter of political opinion or moral critique.  See United States v. Suris, 2019 WL 13176335, at *3 (C.D. Cal. Aug. 1, 2019) ("Defendants are precluded from arguing for or otherwise seeking jury nullification"); United States v. Castro-Cabrera, 534 F.

12

Supp. 2d 1156, 1162 (C.D. Cal. 2008) (excluding immigration-policy argument as "an attempt to invite jury nullification"). Accordingly, a defendant has no right to seek jury nullification, United States v. Navarro-Vargas, 408 F.3d 1184, 1198 (9th Cir. 2005), and the Court may instruct jurors to disregard such appeals. United States v. Blixt, 548 F.3d 882, 890 (9th Cir. 2008).

C.    **Other Impermissible Arguments and Evidence**

The highly charged public discourse surrounding protests relating to Federal government policies raises concerns that extraneous diversions may distract the jury from following the Court's instructions and rendering a verdict only based upon facts introduced at trial. These concerns may be mitigated partially by a fulsome *voir dire* of the venire. But the heightened risks that the jury may deviate from the Court's charge deserve discussion here.

The July 17, 2025 protest attended by ESCOBAR and GUTIERREZ included political speech opposing U.S. government immigration policies. The graffiti ESCOBAR wrote on Roybal parking barriers was also directed at this issue. These policies are not, in any respect, relevant to the issue of whether ESCOBAR and GUTIERREZ assaulted Federal employees or whether ESCOBAR depredated Federal property.

The United States anticipates that the defendants may attempt to introduce or raise U.S. immigration policy, frame a defendant's conduct as political expression against this policy, or otherwise

13

deflect the jury's attention away from the *facta probanda*.[2]  Any such effort would serve no legitimate evidentiary purpose and would invite the jury to decide the case based upon emotion, sympathy, or as an expression of disagreement with federal immigration policy, rather than on the admitted evidence, facts and applicable law.

In the same vein, the defendants may not attempt to justify their conduct by claiming it was a form of First Amendment expression.  This is not a First Amendment case.  Defendants are charged with assaulting Federal employees and defacing Federal property.  This conduct is not constitutionally protected. See, e.g., Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949) (First Amendment does not protect "speech or writing used as an integral part of conduct in violation of a valid criminal statute").

The defendants' charged conduct is also not protected:  "[t]he First Amendment does not protect violence."  See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 916 (1982); Grayned v. City of Rockford, 408 U.S. 104, 116 (1972) ("where demonstrations turn violent, they lose their protected category as expression"); United States v. Walli, 2013 WL 1838159, at *11 (E.D. Tenn. Apr. 30, 2013) (section 1361:  First Amendment inapplicable because defendants' "'reason for the intent is irrelevant,' and their religious and political motivations would be irrelevant.").  Thus, neither defendants'

---

[2] Counsel for the United States has discussed this concern with defendants' counsel, and they have indicated they have no intent to pursue these impermissible subjects.  Nonetheless, the Government is concerned that these subjects may arise during defendants' testimony.

14

assaults of Federal officers nor ESCOBAR's depredation of Federal property can be construed as protected speech.

Accordingly, any attempt to frame defendants' conduct as protected under the First Amendment – whether as "protest activity," or "political speech" – would be irrelevant, legally incorrect, misleading, and unfairly prejudicial under 401, 402, and 403.

**C.    ESCOBAR's Recent False Statements to Extort a Local Businessman Are Proper Lines of Inquiry on Cross Examination If ESCOBAR Testifies**

1.    *ESCOBAR's False Statements and Threats*

On March 17, 2026, the government received evidence from the Los Angeles Police Department (LAPD) showing that, beginning in November 2025 and continuing through in or around February 2026, ESCOBAR repeatedly made false and baseless public allegations regarding a local business owner (B.S.).[3]  Specifically, ESCOBAR publicly and falsely accused B.S. of being a "pedophile" and a "rapist," and falsely alleged that his business was a "drop shipping jewelry scam." ESCOBAR's allegations were categorically false and she had no basis in fact to make them.  Rather, ESCOBAR threatened that she would continue to make these allegations against B.S.and his business until B.S. gave her money – either "a sizeable donation to my charity" or "$5,000 to help those impacted by ice raids in LA."  Ex. 1.[4]

---

[3] This evidence has been provided to the defense.

[4] The government attaches some of these exchanges so that the Court may see the nature and extent of ESCOBAR's threats against B.S.
*(footnote cont'd on next page)*

15

ESCOBAR's false statements and threats emerged from a dispute in November 2025 between her and B.S. at the Silverlake Farmer's Market, where B.S. operates a business.  ESCOBAR and others were soliciting signatures for a "Keep ICE out of LA" petition.  B.S. reported that ESCOBAR was not getting much response, and B.S.said, "hey that's what everyone voted for."  ESCOBAR then grew angry, swore at B.S., and stated, "All MAGA supporters are pedophiles".  Ex. 2.

ESCOBAR – who is associated with the advocacy organization, "Grassroots Activist International Association," messaged the Instagram account of B.S.  stating: "One of your workers at the silverlake farmers market made pro trump, pro ice, comments at a local woman and activist of color. In a city built on diversity this is just bad business. Firing this person isn't enough you will donate $5000 to help those impacted by ice raids in LA if you need help finding a legitimate org we can help but it's up to you who.  And show receipts.  If this isn't done it's gonna be absolute war. I'm holding back so many community members coming for blood because of this video the only way out is reparations to the harm that was caused."  Ex. 1.

---

.  These exhibits, including ESCOBAR's Instagram messages and the LAPD's reports, supply the requisite "good faith belief in the misconduct of the defendant which was the subject of the question" needed to press these questions on cross examination.  United States v. Davenport, 753 F.2d 1460, 1463 (9th Cir. 1985).  Victim's name and the names of other witnesses have been redacted from this filing, as Victim has expressed concern for the safety of his family.

16

ESCOBAR forwarded a statement by another Instagram user that a person at B.S.'s business had made a racial slur.[5]  ESCOBAR forwarded a message she sent to the managers of Silverlake Farmer's market, claiming that someone at B.S.'s business had made "anti-immigrant and pro-ICE sentiment towards a visibly ethnic woman."  Ex. 3.

ESCOBAR forwarded a message she received from the Silverlake Farmer's Market manager, apologizing for the incident.  Along with the message, ESCOBAR said to B.S.: "You could respond and apologize. Maybe make a sizeable donation to my charity.  Or I can kick you out of every farmer's market in LA, your choice."  Ex. 2, 3.

On February 20, 2026, ESCOBAR again threatened B.S. at the Silverlake Flea Market, calling him a racist and threatening, "I got you banned from Silverlake so I think I'll get you banned from this too."  Ex. 2, 3.

B.S. described to LAPD how the next afternoon, on February 21, 2026, ESCOBAR had,

> run through the building screaming that B.S. was a pedophile/rapist and that he donates to ICE. As he sat at his booth outside selling his jewelry to customers, [ESCOBAR] approached him and threw something at him which struck him in the abdomen. Victim described the item as "some type of balled up material." He said he was scared because he was not sure what could be inside of the ball. The suspect then shouted something about [B.S.] being a pedophile and supporting ICE.

Ex. 2.

---

[5] According to B.S., this allegation was false and the poster admitted to him that it was false and had taken it down.

17

B.S. also provided LAPD with an Instagram video where ESCOBAR, at the Silverlake Farmers Market, points to B.S.'s s business and calls it a "drop shipping jewelry scam manned by a pro ICE, pro Trump, MAGA shithead."  Ex. 3.

2. *Use of ESCOBAR's False Statements at Trial*

The United States does not currently intend to present in its case in chief evidence of ESCOBAR's false and defamatory statements or threats of violence and extortion against B.S. .  However, if ESCOBAR testifies or otherwise opens the door, the United States will proffer questions or evidence relating to her lies about B.S. and his business, as well her threats and acts of violence, for the purposes detailed here:

First, ESCOBAR's false and baseless statements that B.S. was a "rapist" and a "pedophile" and that his business was a "drop shipping jewelry scam," are probative of her dishonesty and are proper lines of inquiry on cross examination under Federal Rule 608(b).  See, e.g., United States v. Olsen, 704 F.3d 1172, 1184 n.4 (9th Cir. 2013) ("Rule 608(b) of the Federal Rules of Evidence authorizes courts to permit inquiry into specific instances of conduct during cross-examination if they are probative of the character for untruthfulness of the witness—subject, of course, to the balancing analysis of Rule 403.").

Further, ESCOBAR's demands that B.S. make a sizable donation" to her charity or pay $5,000 to another charity explain why she made public these baseless accusations.  These threats themselves

18

represent evidence of her lack of trustworthiness and veracity.  See United States v. Jones, 2005 WL 8165345, at *2 (N.D. Ohio Aug. 5, 2005) ("extortion[] constitutes a crime involving dishonesty"); Geiger v. Monroe Cnty., Mississippi, 2022 WL 4467673, at *3 (N.D. Miss. Sept. 26, 2022)("If Sloan's alleged prior bad acts involve extortion, it likely would be probative of his character for truthfulness."); Tapp v. Tougas, 2018 WL 1918605, at *3 (N.D.N.Y. Apr. 20, 2018) (extortion is "probative of the character for truthfulness or untruthfulness");  but see Haynes v. Kanaitis, 2004 WL 717115, at *2 (D. Conn. Mar. 3, 2004)("not clear that *all* conduct constituting 'larceny' involves dishonesty, such as extortion").

Second, ESCOBAR's extortion attempts and threats of violence (e.g., threatening "absolute war" and community members "coming for blood"), are relevant if she attempts to introduce (1) evidence suggesting a reputation for peaceful character or nonviolent protest; e.g., United States v. Giese, 597 F.2d 1170, 1192 (9th Cir.1979) (permitting cross examination "contradicting [defendant's] character evidence and impeaching his veracity as a witness"), or (2) argument that her spitting on FPS inspector C.C. was an act of self-defense – since the false statements against Victim reveal a common plan or *modus operandi* as an immigration advocate to fabricate false allegations of wrongdoing to justify her wrongful or illegal conduct. E.g., United States v. Oliphant, 525 F.2d 505, 507 (9th Cir. 1975).

19

## VII. CONCLUSION

The United States respectfully requests leave to supplement this trial memorandum as necessary.

20